**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**Columbia Division**

MEDICAL CARE CONSULTING, LLC
D/B/A THREE OAKS HOSPICE,

Plaintiff,

v.

ROBERT F. KENNEDY, JR., IN HIS OFFICIAL CAPACITY AS THE SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

Defendant.

Civil Action No.: 3:26-cv-5752-MGL

## CONSOLIDATED COMPLAINT FOR JUDICIAL REVIEW

Plaintiff, Medical Care Consulting, LLC d/b/a Three Oaks Hospice ("Three Oaks"), by and through its undersigned legal counsel, hereby files this Consolidated Complaint for Judicial Review against Defendant, Robert F. Kennedy, Jr., in his official capacity as the Secretary of the U.S. Department of Health and Human Services ("Secretary"), following the entry of several administrative orders by the Medicare Appeals Council ("Council") as to the Council docket numbers and Office of Medicare Hearings and Appeals ("OMHA") appeal numbers referenced in the appendix filed contemporaneously herewith, and expressly incorporated herein, and in support thereof states as follows:

## PARTIES

1. Three Oaks is a limited liability company organized under the laws of the State of South Carolina and a Medicare-certified provider of hospice services. Three Oaks' principal place of business is located at 101 Westpark Boulevard, Suite B, Columbia, South Carolina,

29210.

2. Robert F. Kennedy, Jr. is the Secretary of the U.S. Department of Health and Human Services ("HHS") and the proper Defendant in this action pursuant to 42 C.F.R. § 405.1136(d)(1).

**JURISDICTION AND VENUE**

3. The Court has jurisdiction over this action pursuant to 42 U.S.C. § 1395ff(b)(1)(A) (incorporating by reference 42 U.S.C. § 405(g)), which authorizes judicial review of the Secretary's final decisions regarding Medicare reimbursement disputes.

4. Venue is proper pursuant to 42 U.S.C. § 1395ff(b)(1)(A) because Three Oaks' principal place of business is located in this judicial district. Assignment to the Columbia Division is proper under Local Civil Rule 3.01 because Three Oaks' principal place of business is in Columbia, South Carolina.

5. The amount in controversy exceeds the jurisdictional requirement set forth at 42 U.S.C. § 1395ff(b)(1)(E)(i).

6. This action has been initiated within 60 days of the Council's administrative orders dated September 15, 2026, as required by 42 C.F.R. § 405.1132(b).

**ADMINISTRATION OF THE MEDICARE PROGRAM**

7. Medicare is the federal health insurance program for the elderly and disabled established in 1965. The Medicare statute is codified at 42 U.S.C. § 1395 *et seq.*

8. The Medicare program is administered by the Centers for Medicare and Medicaid Services ("CMS"), which is an agency within HHS.

9. CMS engages with numerous private contractors to assist in the administration of the Medicare program. The types of contractors relevant to this matter include Medicare

Administrative Contractors ("MACs"), Supplemental Medical Review Contractors ("SMRCs"), and Qualified Independent Contractors ("QICs").

10. MACs perform numerous functions on behalf of CMS, including but not limited to claims processing, beneficiary and provider enrollment, adjudication of administrative claim appeals, development of Medicare policies, and provider outreach and education. *See* 42 U.S.C. § 1395kk-1(a)(4).

11. SMRCs perform medical review audits of providers' claims on a post-payment basis to ensure those claims met all Medicare requirements for coverage and payment at the time they were submitted. *See id.* § 1395ddd(a)-(b).

12. QICs conduct administrative claim appeals known as "reconsiderations" on behalf of CMS. *See id.* § 1395ff(c).

13. Each CMS contractor is responsible for overseeing or assisting with Medicare program operations in a dedicated geographic area of the country. For example, the MAC with "jurisdiction" over hospice providers in South Carolina, like Three Oaks, is Palmetto GBA ("Palmetto").

**MEDICARE COVERAGE OF HOSPICE SERVICES**

14. Medicare covers reasonable and necessary hospice services provided to eligible beneficiaries. CMS explains the purpose and goals of hospice care as follows:

> Hospice care is an approach to caring for the terminally ill individual that provides palliative care rather than traditional medical care and curative treatment. Palliative care is an approach that improves the quality of life of patients and their families facing the problems associated with life-threatening illness through the prevention and relief of suffering by means of early identification, assessment and treatment of pain and other issues. Hospice care allows the patient to remain at home as long as possible by providing support to the patient and family, and by keeping the patient as comfortable as possible while maintaining his or her dignity and quality of life.

Medicare and Medicaid Programs; Hospice Conditions of Participation, 73 Fed. Reg. 32088, 32088 (June 5, 2008).

15. Medicare defines the term "hospice services" to include all services, medications, and equipment necessary for the palliation and management of a terminal condition. Hospice services may include, but are not limited to, physician services, nursing care, medical social services, spiritual counseling services, short-term inpatient care, and physical, occupational, and speech therapy. *See* 42 U.S.C. § 1395x(dd)(1); *see also* 42 C.F.R. § 418.3.

16. To qualify for the Medicare hospice benefit, a beneficiary must elect to receive hospice care and be certified as terminally ill by a physician. 42 C.F.R. § 418.20. An individual is considered "terminally ill" when he or she has a life expectancy of six months or less if the illness runs its normal course. 42 U.S.C. § 1395x(dd)(3)(A).

17. Once a beneficiary elects to receive hospice services, the hospice medical director (and the beneficiary's attending physician, when so designated) must certify that the beneficiary is terminally ill.[1] The certification is based on the medical director's or physician's clinical judgment regarding the normal course of the patient's illness. 42 U.S.C.. § 1395f(a)(7)(A).

18. Each hospice certification covers a designated benefit period. Beneficiaries are entitled to receive hospice services through two consecutive 90-day benefit periods followed by an unlimited number of 60-day benefit periods. *Id.* The hospice medical director and beneficiary's attending physician, if one has been designated, must execute a written certification document at the beginning of each certification period.[2] *Id.*

[1] A beneficiary's "attending physician" is the physician, nurse practitioner, or physician assistant whom the beneficiary identifies as having the most significant role in the determination and delivery of medical care to the beneficiary at the time he or she elects to receive hospice care. 42 U.S.C. § 1395x(dd)(3)(B). Beneficiaries are not required to designate attending physicians.

[2] The medical director and the beneficiary's attending physician must both execute the certification covering the first benefit period. The Medicare statute and CMS regulations only require the hospice medical director to execute each

19. Each certification must include a brief narrative explanation of the clinical facts that support the beneficiary's terminal prognosis. 42 C.F.R. § 418.22(b)(3). Certifications must conform to other content and timeliness requirements specified by CMS. *Id.* § 418.22(b).

20. The Medicare statute and CMS regulations expressly recognize the centrality of the hospice physician's clinical judgment with respect to hospice patient eligibility determinations. *See* 42 U.S.C. § 1395f(a)(7)(A)(i); 42 C.F.R. § 418.22(b). In recognition of the pivotal nature of the hospice physician's discretion and clinical judgment in the patient eligibility determination process, CMS has previously considered and expressly declined to create specific criteria that would govern or constrain that clinical judgment. *See* 73 Fed. Reg. at 32138.

21. Beginning with the third benefit period and continuing for each benefit period thereafter, a hospice physician or hospice nurse practitioner must conduct a face-to-face encounter with the beneficiary to perform an assessment and gather clinical evidence relevant to the beneficiary's terminal condition and ongoing hospice eligibility. 42 U.S.C. § 1395f(a)(7)(D). Face-to-face encounters, like hospice certifications, must meet various documentation requirements established by CMS. *See* 42 C.F.R. § 418.22(a)(4).

22. The only beneficiary eligibility requirement for hospice services set forth in the Medicare statute and CMS regulations is that the beneficiary be terminally ill with a life expectancy of six months or less if the illness runs its normal course. *See* 42 U.S.C. § 1395x(dd)(1); 42 C.F.R. § 418.20.

23. CMS does not require that beneficiaries exhibit rapid decline in their conditions, unstable medical problems, or uncontrolled symptoms to be eligible for the Medicare hospice benefit. *See* 74 Fed. Reg. 39384, 39399 (Aug. 6, 2009) ("We acknowledge that not all patients

---

certification thereafter, although the beneficiary's attending physician may also participate in the subsequent certification processes. *Id.* § 1395f(a)(7)(A)(ii).

will show measurable decline at the time of recertification.").[3]

24. In fact, CMS has acknowledged that a beneficiary can remain eligible for the Medicare hospice benefit if his or her condition remains stable or even improves while on hospice. *See* Medicare Program; FY 2015 Hospice Wage Index and Payment Rate Update; Hospice Quality Reporting Requirements and Process of Appeals for Part D Payments for Drugs for Beneficiaries Enrolled in Hospice, 79 Fed. Reg. 50452, 50471 (Aug. 22, 2014) (patient may, in view of the "full clinical picture," be eligible for hospice even if his or her condition has stabilized or improved); Medicare Program; Home Health Prospective Payment System Rate Update for Calendar Year 2011; Changes in Certification Requirements for Home Health Agencies and Hospices, 75 Fed. Reg. 70372, 70448 (Nov. 17, 2010) ("A patient's condition may temporarily improve with hospice care.").

25. Both Congress and CMS have recognized the inherent difficulty in prognosticating life expectancy. *See* Medicare Benefit Policy Manual (MBPM) Ch. 9 § 10 (CMS IOM Pub. 100-02, Rev. 246) (2018) ("Predicting life expectancy is not always exact."); 79 Fed. Reg. at 50470 ("[W]e also have recognized the challenges in prognostication" and therefore expect "that the certifying physicians will use their best clinical judgment."); Medicare Program; Hospice Care Amendments, 67 Fed. Reg. 70363, 70364 (Nov. 22, 2002) (noting that Congress removed the 210-day hospice benefit period cap originally enacted in 1982 due to "the scientific difficulty in making a prognosis of six months or less.").

26. CMS has developed various sub-regulatory guidance documents, such as the MBPM, that elaborate on and clarify coverage and payment rules set forth in Medicare

[3] Palmetto, the MAC whose jurisdiction includes South Carolina, has similarly released guidance to the hospice stakeholder community stating there is, "[N]o requirement that 'significant documented decline' must be included in the record [to substantiate Medicare coverage of hospice services].'"). Palmetto GBA, *Hospice Coalition Questions and Answers*, at 3–4 (Sept. 23, 2008), *available at* https://www.yumpu.com/en/document/read/41131953/september-23-2008-hospice-coalition-questions-palmetto-gba/3 (last accessed November 8, 2026).

regulations. *See generally* MBPM Ch. 9 § 10 *et seq.*

27. MACs also create Medicare coverage policies on behalf of CMS. These documents are called Local Coverage Determinations ("LCDs"). LCDs are guidance documents respecting whether a particular service or item is considered medically reasonable and necessary throughout the MAC's jurisdiction.[4] 42 U.S.C. § 1395ff(f)(2)(B).

28. Palmetto has promulgated LCDs that are relevant to the hospice services furnished to beneficiaries with specific terminal illnesses, including but not limited to L34547 ("Hospice – Neurological Conditions") and L34567 ("Hospice – Alzheimer's Disease and Related Disorders"). These LCDs set forth suggested guidelines for hospice providers to utilize in determining and documenting whether a beneficiary is terminally ill.

29. The LCDs relevant to this case contain recommended criteria for hospices to use when documenting services, as evidenced by the MAC's use of words such as "should" and "may" as opposed to mandatory language, such as "shall" and "must."

30. For example, L34567 states in relevant part: "Alzheimer's Disease (AD) and related disorders may support a prognosis of six months or less under many clinical scenarios. The identification of specific structural/functional impairments, together with any relevant activity limitations, ***should*** serve as the basis for palliative interventions and care planning." L34567 at 3 (emphasis added). The LCD goes on to provide that, "Ultimately, the combined effects of the AD…and any comorbid [or secondary] condition ***should*** be such that ***most*** beneficiaries with AD…and similar impairments would have a prognosis of 6 months or less." *Id.* at 4 (emphasis added). The LCD then concludes: "For beneficiaries with AD to be eligible for hospice, the individual ***should*** have [advanced Alzheimer's Disease] and specific comorbid or

[4] Some provisions of the Medicare statute use the outdated terms "fiscal intermediary" and "carrier," which were the predecessor entities to MACs.

secondary conditions meeting the above criteria." *Id.* (emphasis added). L34547 contains similarly permissive language applicable to beneficiaries suffering from terminal neurological conditions.

31. The LCDs reference various evidence-based prognostic tools for hospice providers to use when documenting patient eligibility. For example, L34567 incorporates the Reisberg Functional Assessment Staging Tool (FAST) scale, which healthcare providers use to objectively assess the progression of Alzheimer's Disease.[5] The FAST scale includes alphanumeric scores from 1 to 7F that correlate with various degrees of cognitive and functional decline. A score of 1 represents an individual with normal cognitive capabilities, whereas a score of 7A, for example, represents an individual with severe cognitive and functional impairments. These impairments include bowel and bladder incontinence, the need for assistance to complete basic self-care tasks such as bathing and dressing, and an inability to communicate more than 5-6 intelligible words per day.

32. The FAST scale is only validated as a prognostic tool for hospice patients suffering from end-stage Alzheimer's Disease.[6]

33. Another widely accepted prognostic tool is the Palliative Performance Scale (PPS). The PPS measures decline across multiple domains, such as physical function, level of consciousness, and nutritional intake, that is associated with advanced disease. PPS scale scores range from 100% (representing a normal, healthy adult) to 0% (representing death) in increments of 10. Lower PPS scores represent significant disease progression and are highly correlated with life expectancies of months to weeks in duration. A PPS score of 10%, for example, indicates a bedbound patient who is incapable of tolerating any nutritional intake and essentially comatose.

---

[5] *See generally* Sclan, S.G. & Reisberg, B., *Functional Assessment Staging (FAST) in Alzheimer's Disease: Reliability, Validity, and Ordinality,* 4 INT'L PSYCHOGERIATRICS 55, 55–69 (1992).
[6] *Id.*

34. Unlike the FAST scale, PPS scores can be prognostically relevant to terminal status in any disease process.

35. The LCDs are only one path to documenting and establishing beneficiary eligibility for hospice services. As the two LCDs applicable to this case state, a beneficiary can be eligible for hospice services due to Alzheimer's Disease or a related disorder or a neurological condition "under many clinical scenarios." *See* L34547 at 3; L34567 at 3.

36. A beneficiary is discharged from hospice when he or she passes away, revokes the election to receive hospice care (if, for example, he or she wishes to pursue curative treatment for the terminal illness), wishes to transfer to a different hospice provider, or moves outside of the hospice's designated service area. 42 C.F.R. § 418.26.

37. Although hospice physicians must execute certifications covering benefit periods that are 90 days and 60 days in length, CMS requires that claims for hospice services be billed in monthly increments. Medicare Claims Processing Manual Ch. 11 § 90 (CMS IOM Pub. 100-04, Rev. 3502) (2016).[7]

**<u>MEDICARE CLAIM AUDITS AND APPEALS</u>**

38. In the event a CMS contractor, such as a SMRC, denies a Medicare claim on a post-payment basis, then the provider is responsible for repaying any overpayment associated with the denied claim.

39. Providers who are dissatisfied with an adverse claim determination may contest that decision through a four-step administrative appeals process. *See* 42 U.S.C. § 1395ff(b).

[7] For example, if Ms. Smith elected hospice care on April 20 and lived through at least the month of May, the hospice's first Medicare claim would cover dates of service from April 20 to April 30. The next claim submitted by the hospice would include dates of service from May 1 through May 31.

40. The four steps in CMS' administrative claim appeal process are redetermination, reconsideration, a hearing before an administrative law judge ("ALJ"), and review by the Council.

41. Requests for redetermination are processed by MACs. Requests for reconsideration are handled by QICs. Hearing requests are adjudicated by ALJs within OMHA. The Council conducts the fourth-level review in the administrative process and often, but not always, renders final decisions on behalf of the Secretary.

42. A redetermination consists of an independent review of an initial claim determination. During the redetermination process, the MAC reviews the evidence and findings upon which the initial determination was based along with any additional evidence submitted by the provider. The MAC then issues a decision affirming or reversing (in whole or in part), the initial determination in question. 42 C.F.R. §§ 405.948, 405.954. A provider that is dissatisfied with a redetermination decision may seek review of that decision by the QIC.

43. A reconsideration consists of an independent, on-the-record review of an initial determination and redetermination. The QIC will review the evidence and findings upon which the initial determination and redetermination were based along with any additional evidence submitted by the provider. *Id.* §§ 405.968(a)(1), 405.976(b). A provider that is dissatisfied with a reconsidered determination may seek review of that decision by an ALJ.

44. The ALJ hearing is the provider's only opportunity to present its case in real time to an adjudicator. ALJ hearings are usually conducted via telephone. The provider may present written statements about the facts and law relevant to the case, offer witness testimony, and make arguments regarding the issues in the case. *Id.* §§ 405.1020(b)(2), 405.1032(a), 405.1036(a)-(e).

45. ALJs review cases *de novo*. ALJs are not bound by CMS sub-regulatory guidance

documents or LCDs but may give substantial deference to those policies in cases where they are applicable. *Id.* §§ 405.1000(d), 405.1062(a).

46. The administrative record before the ALJ consists of all evidence used in the initial determination, redetermination, and reconsideration processes as well as the evidence offered at the hearing or otherwise admitted into the record by the ALJ. Each hearing decision must contain, among other things, independent findings of fact, conclusions of law, and the reasons for the decision. *Id.* §§ 405.1042, 405.1046(a)(1). A provider that is dissatisfied with an ALJ's decision may seek review by the Council.

47. The Council conducts *de novo* reviews of ALJ decisions. The Council is generally required to issue a decision within 90 days of receiving a request for review. 42 U.S.C. § 1395ff(d)(2). In the event the Council is unable to adjudicate an appeal within 90 days of receipt, the provider may file a request to "escalate" its appeal to federal district court. Within five days of receiving the provider's escalation request, the Council must either render a decision or confirm it is unable to issue a decision and permit the provider to proceed to federal district court. *Id.* § 1395ff(d)(3)(B); 42 C.F.R. § 405.1132.

48. In a case where a provider escalates an appeal from the Council to federal court, the ALJ's decision becomes the Secretary's final decision for purposes of judicial review. *See, e.g., Ashli Healthcare, Inc. v. Becerra*, 2024 WL 389104, at *1 (E.D. Cal. Aug. 21, 2024).

## FACTUAL AND PROCEDURAL BACKGROUND

49. At all times relevant hereto, Three Oaks was a Medicare-certified provider of hospice services. Three Oaks provides high-quality hospice services to the residents of the greater Columbia, South Carolina area, many of whom are Medicare beneficiaries.

50. At all times relevant hereto, Noridian Healthcare Solutions, LLC ("Noridian") was a SMRC operating under contract with CMS.

51. Noridian previously sent notice to Three Oaks of its intent to conduct a post-payment audit of certain hospice claims billed to the Medicare program from 2021 to 2024. The audit covered numerous claims for services rendered to five Medicare beneficiaries, including the three beneficiaries whose claims are at issue in this case: L.E., J.K., and B.B. Three Oaks submitted its medical records to the SMRC as requested.

52. After completing its review, Noridian alleged that all of the services furnished to L.E. (for the period April 21, 2023 to July 31, 2024), J.K. (for the period March 28, 2023 to March 11, 2024), and B.B. (for the period October 1, 2021 to July 31, 2024) failed to meet Medicare coverage criteria and should not have been reimbursed. The SMRC therefore asserted that Three Oaks had received Medicare overpayments totaling approximately $275,000 for the claims in question.

53. Following receipt of the SMRC's audit determination, Three Oaks promptly filed requests for redetermination with Palmetto contesting the SMRC's adverse decisions. In various unfavorable redetermination notices issued throughout June and July 2025, the MAC upheld Noridian's overpayment findings.

54. Three Oaks then sought reconsideration with the QIC, C2C Innovative Solutions, Inc. ("C2C"). The QIC, by way of various unfavorable decisions issued throughout August and September 2025, affirmed all aspects of the overpayment determinations.

55. On or about October 29, 2025, Three Oaks requested a hearing before an ALJ to challenge the QIC's unfavorable decisions as to beneficiary J.K. Approximately one week later on November 7, 2025, Three Oaks filed an ALJ appeal to contest beneficiary L.E.'s denied

claims. On November 12, 2025, Three Oaks filed a hearing request for the denied claims associated with B.B. The appeals were assigned to different ALJs and adjudicated separately.

**Beneficiary L.E.**

56. The ALJ to whom the L.E. appeals were assigned ("ALJ 1") conducted an evidentiary hearing on December 8, 2025, regarding the 16 claims in question for beneficiary L.E. Three Oaks was represented by counsel and presented legal argument along with the clinical testimony of Julia Nichols, RN. Ms. Nichols is a nurse consultant with extensive experience in the hospice field.

57. In January 2026, ALJ 1 issued a series of unfavorable decisions upholding the contractors' adverse determinations as to all claims for beneficiary L.E. Although ALJ 1 adjudicated each claim in a separate decision, his decisions were, in most respects, very similar and even identical in many respects.

58. While ALJ 1 made slight revisions to the sections of the decisions setting forth his findings of fact for each claim, ALJ 1's conclusions for each claim were identical. ALJ 1 determined that, for every claim, "The documentation supports the Beneficiary had a FAST level of 7b, but the clinical findings do not support a terminal prognosis of six months or less." ALJ 1 then went on to find in every case: "[T]he documentation does not demonstrate how the combined effects of the Beneficiary's dementia diagnosis (FAST stage 7b) and impairments related to her comorbidity of essential hypertension support a prognosis of six months or less."

59. Although ALJ 1 went to great lengths to summarize the evidence in the record and Three Oaks' position regarding Medicare coverage in each of his decisions, those decisions are bereft of any analysis connecting the facts found with the choice made.

60. The administrative record supports that, at the time of the services in question,

L.E. was a frail 74 year-old female with end-stage Alzheimer's Disease. Her FAST score was 7B, and her PPS score was only 40%. L.E. was cachectic, incontinent of stool and urine, and severely lethargic with hypersomnolence. She was dependent on others for most self-care and activities of daily living ("ADLs"). L.E.'s speech was incomprehensible, and she exhibited worsening agitation secondary to her terminal condition.

61. During the dates of service under review, the administrative record reflects that L.E. suffered from ongoing cardiac complications (such as significant bradycardia and hypotension) and weight loss. She became increasingly combative as a result of her progressive Alzheimer's Disease and consumed less than 25% of meals. L.E.'s FAST score decreased to 7C. She sustained multiple falls with injuries (including a suspected facial fracture, a humerus fracture, and a dislocated shoulder) and tested positive for COVID-19 twice.

62. Although ALJ 1 summarized the foregoing facts in his decisions, he never explained *why* the clinical information in the record failed to support that L.E. had a prognosis of six months or less. ALJ 1 likewise failed to explain why he had rejected the uncontradicted professional opinion of Ms. Nichols or the clinical judgment of the treating hospice physicians that L.E. was terminally ill throughout the dates of service.

63. ALJ 1 noted that the applicable LCD, L34567, was a non-binding guidance document, but he nevertheless "used [it] to determine whether the clinical findings related to the diagnosis of Alzheimer's Disease and related disorders supported a prognosis of six months or less." ALJ 1's decisions do not indicate why a permissive coverage policy required denial of all claims under review.

64. On March 20, 2026, Three Oaks filed a request for the Council to review ALJ 1's unfavorable decisions as to the 16 claims for L.E.

65. On August 31, 2026, Three Oaks notified the Council of its intent to escalate its pending appeals to federal district court. On September 15, 2026, the Council entered 16 administrative orders confirming that it was unable to adjudicate Three Oaks' appeals within 90 days.

66. ALJ 1's decisions as to the claims for beneficiary L.E. therefore represent the Secretary's final decisions pursuant to 42 U.S.C. § 1395ff(b)(1)(A), and these matters are now eligible for judicial review.

**Beneficiary J.K.**

67. The second ALJ ("ALJ 2") presided over a consolidated evidentiary hearing on January 6, 2026 regarding Three Oaks' appeals for 13 claims for hospice services rendered to beneficiary J.K. Three Oaks was again represented by counsel, and Ms. Nichols testified regarding the clinical and coverage issues in dispute.

68. In February 2026, ALJ 2 issued a series of 13 decisions adjudicating each claim under appeal. ALJ 2 found that Medicare did not cover the hospice services provided to J.K. from March 28, 2023 to August 31, 2023. ALJ 2 went on to determine that Medicare coverage existed for the remaining claims.

69. ALJ 2's unfavorable decisions were similar in most material respects and rested on findings that J.K. was purportedly ineligible for the Medicare hospice benefit during the dates of service in question.

70. J.K. was a 72 year-old male with a terminal diagnosis of atypical parkinsonism. His comorbidities included dementia, behavioral disturbances, diabetes, giant cell arteritis, and benign prostatic hypertrophy. In the months leading up to his hospice admission, J.K. fell down the stairs in his home, experienced a functional decline, had difficulty making his needs known,

and suffered significant unintentional weight loss. Due to the progression of his terminal condition, J.K. and his family elected to pursue comfort-focused hospice care.

71. Throughout the dates of service in question, the medical records reflect that J.K. suffered from dysphagia (difficulty swallowing) necessitating a modified diet along with left-sided facial drooping and drooling. He had upper extremity tremors, and the hospice staff assessed him with muscle wasting and increased weakness. J.K. slept up to 18 hours a day, and his worsening back pain interfered with his daily activities and movement. He experienced visual hallucinations, and at one point he was found in the kitchen of his home by his spouse holding a knife and attempting to stab a person who was not there. J.K.'s appetite was poor, and he experienced intermittent shortness of breath. The hospice physician ordered numerous changes to J.K.'s medication regimen in an effort to manage his deteriorating condition.

72. ALJ 2 determined that J.K. was not eligible for hospice services during the denied dates of service because, among other reasons, the documentation did not support the PPS and FAST scores documented at the time of his hospice admission or that J.K. had not experienced significant weight loss.

73. The FAST scale is only validated as a prognostic tool for patients suffering from Alzheimer's Disease, which J.K. did not have. Therefore, ALJ 2 erred in considering this information when evaluating whether J.K. was eligible for hospice services.

74. Contrary to ALJ 2's decisions, the administrative record demonstrates a decline in J.K.'s PPS score and an unintentional weight loss in the months preceding his hospice admission, both of which are consistent with a terminal prognosis.

75. ALJ 2 did not explain why she refused to accept the unrebutted testimony of Ms. Nichols or why she elected not to defer to the clinical judgment of the treating hospice physicians that J.K. was terminally ill throughout the dates of service.

76. On April 6, 2026, Three Oaks asked the Council to review ALJ 2's unfavorable decisions.

77. On August 31, 2026, Three Oaks filed a request with the Council to escalate its pending appeals to federal district court. The Council issued an administrative order on September 15, 2026 granting Three Oaks' request.

78. ALJ 2's decisions for beneficiary J.K. constitute the Secretary's final decisions for those matters pursuant to 42 U.S.C. § 1395ff(b)(1)(A), and those cases are now eligible for judicial review.

**Beneficiary B.B.**

79. The ALJ to whom the B.B. appeal was assigned ("ALJ 3") held an evidentiary hearing on February 5, 2026, regarding Three Oaks' appeal involving the 34 claims for hospice services rendered to beneficiary B.B. Legal counsel presented Three Oaks' case for coverage during the hearing, which included clinical testimony from Ms. Nichols.

80. On February 10, 2026, ALJ 3 issued an unfavorable decision denying Medicare coverage for all hospice services provided to B.B.[8] ALJ 3 limited his review of the record to the contents of the physician certifications, and he did not cite or consider any other evidence in the voluminous administrative record. For example, aside from a passing reference to Ms. Nichols' role as a witness during the hearing, ALJ 3 did not mention Ms. Nichols' testimony at any point

[8] The administrative record for this case contains almost 2,500 pages of medical records, and Ms. Nichols testified for approximately 2 hours during the hearing. The notion that ALJ 3 could have reviewed the witness' detailed testimony in conjunction with the record evidence and then prepared a written decision addressing 34 separate claims for Medicare coverage in only three business days strains credulity. Instead, it is far more likely that ALJ 3 had written his decision prior to the evidentiary hearing and simply conducted the hearing as a formality.

in his decision. The ALJ 3 abdicated one of his most basic responsibilities under agency regulations by issuing a decision that ignored Three Oaks' entire hearing presentation along with vast amounts of record evidence. *See* 42 C.F.R. § 405.1046(a)(1).

81. ALJ 3's decision contains only two paragraphs of "analysis" addressing 34 separate claims for hospice services. The exhibit list for the case is longer than the ALJ's decision.

82. ALJ 3 found that Medicare did not cover the hospice services furnished to B.B. primarily for two reasons: (1) the documentation reflected that the beneficiary's condition was stable during the dates of service under review; and (2) the relevant LCD criteria were purportedly not met.

83. The record demonstrates that, at the time of her admission to hospice, B.B was a 77 year-old female with end-stage frontotemporal dementia. Her comorbid conditions included venous insufficiency, cerebrovascular disease, and major depressive disorder. B.B. was incontinent of bowel and bladder, non-ambulatory, often incapable of expressing her needs, and required assistance for all self-care tasks.

84. During the dates of service, B.B. tolerated limited nutritional intake and experienced significant unintentional weight loss. She suffered from dysphagia requiring a modified diet, and her caregivers fed her by hand. The patient only ate between 15% and 25% of her meals. B.B. was frequently assessed by the hospice clinicians with bradycardia and hypotension. Her PPS score was only 30%. B.B. exhibited escalating agitation and behavioral symptoms necessitating pharmacological intervention by the hospice physician.

85. ALJ 3's determination that B.B.'s condition was stable throughout the period of service is not supported by the administrative record. Even if this conclusion were accurate,

stability in a patient's condition does not defeat Medicare coverage of hospice services. CMS has expressly stated that a beneficiary's condition may stabilize while receiving hospice care, yet that beneficiary may nonetheless continue to have a six-month prognosis. 79 Fed. Reg. at 50471.

86. ALJ 3 also erred when he found that the factors set forth in the applicable LCD were "necessary" to establishing Medicare coverage for hospice services. L34567 contains only recommended guidelines, not mandatory coverage requirements, for hospice providers to follow when evaluating patient eligibility for the Medicare hospice benefit.

87. On April 10, 2026, Three Oaks filed a request for the Council to review ALJ 3's unfavorable decision.

88. On August 31, 2026, Three Oaks filed a request with the Council to escalate its pending appeal to federal district court. The Council issued an administrative order on November 10, 2026 granting Three Oaks' request.

89. ALJ 3's consolidated decision for beneficiary B.B. constitutes the Secretary's final determinations pursuant to 42 U.S.C. § 1395ff(b)(1)(A) for the claims addressed therein, and this case is now eligible for judicial review.

**COUNT I – INCORRECT LEGAL STANDARDS**

90. Plaintiff hereby incorporates by reference paragraphs 1 through 89 herein.

91. The ALJs have not correctly applied the relevant legal standards governing Medicare coverage of hospice care, including but not limited to statutory and regulatory authority, CMS guidance, and the applicable LCDs.

92. The ALJs have improperly applied non-binding, permissive guidance documents as though they contain mandatory coverage requirements for hospice services. *See Albert v. Burwell*, 118 F.Supp.3d 505 (E.D.N.Y. 2015) (reversing Council decision for misapplying

permissive LCD guidance as though it was mandatory).

93. The ALJs' coverage determinations are also legally erroneous because they do not accord sufficient weight to the clinical judgment exercised by the certifying hospice physicians or the expert testimony of Ms. Nichols. *See Seasons Hospice & Palliative Care of Del., LLC v. Kennedy*, 2025 WL 2174863, at *4-5 (D. Del. July 31, 2025); *Hospice of E. Tex. v. Sec'y of U.S. Dep't of Health and Hum. Servs.*, 2025 WL 1062504, at *18-26 (E.D. Tex. Feb. 21, 2025).

94. The ALJs' coverage determinations are arbitrary and capricious because they failed to examine relevant clinical evidence, considered factors that CMS did not intend to be dispositive, and did not contain rational connections between the facts found and the choices made. *See, e.g., Motor Veh. Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983).

**COUNT II – LACK OF SUBSTANTIAL EVIDENCE**

95. Plaintiff hereby incorporates by reference paragraphs 1 through 94 herein.

96. The ALJs' coverage decisions are unsupported by substantial evidence because the medical records establish that L.E., J.K., and B.B. were terminally ill in that their life expectancies were six months or less if their respective illnesses ran their normal course.

97. No reasonable person would accept the evidence cited by the ALJs in their respective unfavorable coverage decisions as sufficient to support the conclusions that the corresponding hospice claims are not covered by Medicare.

98. In reaching their unfavorable coverage determinations, the ALJs failed to appropriately consider evidence that fairly detracted from their respective decisions.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

99. Reverse the ALJs' decisions that Medicare does not cover the hospice claims at

issue in this case.

100. Award to Three Oaks all costs, damages, and attorneys' fees allowed under applicable law.

101. Grant to Three Oaks any other legal or equitable relief that the Court may deem just and proper.

Respectfully Submitted,

Dated: November 13, 2026

*/s/ Jasmine K. Gardner*
Jasmine K. Gardner
SC Federal ID No. 12531
**MCGUIREWOODS LLP**
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
Tel: (704) 343-2262
Fax: (704) 343-2300
jgardner@mcguirewoods.com

Adam L. Bird (*pro hac vice* application forthcoming)
D.C. Bar No. 1005485
**CALHOUN BHELLA LLP**
2121 Wisconsin Avenue N.W., Suite 200
Washington, D.C. 20007
Tel: (202) 804-6031
Fax: (214) 981-9203
abird@calhounbhella.com

**Attorneys for Plaintiff**